UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,              :      <u>INDICTMENT</u>

        -v.-                           :      11 Cr.

GIAN GISLER,                           :      **11 CRIM 662** ( )

        Defendant.              :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 0 4 2011

<u>COUNT ONE</u>
**(Conspiracy)**

The Grand Jury charges:

**The Defendant and Associated Entities**

1.   At all times relevant to this Indictment, GIAN GISLER, the defendant, was a citizen and resident of Switzerland.

2.   At all times relevant to this Indictment, UBS AG ("UBS") was a bank organized under the laws of Switzerland and was Switzerland's largest bank.

3.   At all times relevant to this Indictment, two Swiss asset management firms ("Swiss Asset Manager No. 1" and "Swiss Asset Manager No. 2") provided wealth management and tax advice to individuals around the world, including to U.S. taxpayers.  Swiss Asset Manager No. 1 and Swiss Asset Manager No. 2 were not depository institutions.  As a result, other financial institutions maintained custody of the accounts of the

clients of Swiss Asset Manager No. 1 and Swiss Asset Manager No. 2. At all times relevant to this Indictment, both Swiss Asset Manager No. 1 and Swiss Asset Manager No. 2 did not maintain an office in the United States.

4. From in or about the mid-1990's until in or about late 2008, GIAN GISLER, the defendant, was a client advisor at UBS AG ("UBS"). From in or about early 2009 until in or about mid to late 2009, GISLER was a client advisor at Swiss Asset Manager No. 1. From in or about mid to late 2009 until at least in or about 2010, GISLER was a client advisor at Swiss Asset Manager No. 2.

## Overview of the Conspiracy

5. From at least in or about the mid-1990's through at least in or about 2010, GIAN GISLER, the defendant, conspired with various U.S. taxpayers and others to ensure that his U.S. taxpayer clients could hide the U.S. taxpayers' Swiss bank accounts, and the income generated in them, from the taxation authority of the United States, the Internal Revenue Service (the "IRS"), via false and fraudulent federal income tax returns.

6. In or about 2001, UBS, one of the Swiss banks at which GIAN GISLER, the defendant, helped his U.S. taxpayer clients hide accounts, voluntarily agreed with the IRS to undertake new obligations with respect to, among other things,

obtaining documents concerning the beneficial owners of accounts at those banks.  In furtherance of the conspiracy, GISLER, together with his U.S. taxpayer clients and others, used sham entities created under the laws of countries other than the United States to hide the Swiss bank accounts, and the income generated in them, from the IRS and to circumvent the commitments that UBS and, later, other Swiss banks to which GISLER had transferred his clients' assets, had made to the IRS.

    7.   And in or about 2008, it became publicly known that UBS was being investigated by law enforcement in the United States and UBS began to exit the business of assisting U.S. taxpayers in maintaining undeclared accounts at UBS in Switzerland.  At or around this time, it became, as a practical matter, impossible for GIAN GISLER, the defendant, to conduct his usual business of assisting U.S. taxpayers in maintaining undeclared accounts at UBS.  As a result, GISLER left the employment of UBS in or about late 2008.

    8.   Starting in or about early 2009, GISLER became employed by Swiss Asset Manager No. 1.  In connection with GISLER's leaving UBS for the employment of Swiss Asset Manager No. 1, GISLER undertook to transfer the accounts of his U.S. taxpayer clients from UBS to other Swiss banks, which held the assets that he managed through his work at Swiss Asset Manager No. 1.

9.     Starting in or about mid-2009, Swiss Asset Manager No. 1 itself began to exit the business of assisting U.S. taxpayers in maintaining undeclared accounts in Switzerland, which again made it, as a practical matter, impossible for GISLER to conduct his usual business of assisting U.S. taxpayers in maintaining undeclared accounts while he was employed at Swiss Asset Manager No. 1.  As a result, in or about mid to late 2009, GISLER left the employment of Swiss Asset Manager No. 1 and, thereafter, became employed by Swiss Asset Manager No. 2.  In connection with leaving Swiss Asset Manager No. 1 for the employment of Swiss Asset Manager No. 2, GISLER undertook to transfer the management of his U.S. taxpayer clients from Swiss Asset Manager No. 1 to Swiss Asset Manager No. 2 so as to continue to manage his U.S. taxpayer clients' undeclared accounts.

10.     The collective maximum value of the assets in undeclared accounts beneficially owned by U.S. taxpayer clients of GIAN GISLER, the defendant, and that were either opened with GISLER's assistance or were managed by GISLER, was more than approximately $215.3 million, as set forth more fully below.

## Background

## Obligations of United States Taxpayers
## With Respect to Foreign Financial Accounts

11.  Citizens and residents of the United States who
have income in any one calendar year in excess of a threshold
amount ("U.S. taxpayers") are obligated to file a U.S.
Individual Income Tax Return, Form 1040 ("Form 1040"), for that
calendar year with the IRS.  On Form 1040, U.S. taxpayers are
obligated to report their income from any source, regardless of
whether the source of their income is inside or outside the
United States.  In addition, on Schedule B of Form 1040, the
filer must indicate whether "at any time during [the relevant
calendar year]" the filer had "an interest in or a signature or
other authority over a financial account in a foreign country,
such as a bank account, securities account, or other financial
account."  If the U.S. taxpayer answers that question in the
affirmative, then the U.S. taxpayer must indicate the name of
the particular country in which the account is located.

12.  Separate and apart from the obligation to file
Forms 1040 that include all income, U.S. taxpayers who have a
financial interest in, or signature authority over, a financial
account in a foreign country with an aggregate value of more
than $10,000 at any time during a particular calendar year are
required to file with the IRS a Report of Foreign Bank and

Financial Accounts, Form TD F 90-22.1 ("FBAR"). The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year. In general, the FBAR requires that the U.S. taxpayer filing the form identify the financial institution with which the financial account is held, the type of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

### Swiss Banks at Which GISLER's U.S. Taxpayer Clients Held Accounts

13.   While GIAN GISLER, the defendant, was employed by UBS from in or about the mid-1990's until at least in or about late 2008, GISLER was typically assigned to serve as a client advisor to U.S. taxpayers, who had, through other client advisors at UBS, already opened undeclared accounts at UBS. Thereafter, as set forth above, GISLER was employed by Swiss Asset Manager No. 1 and, later, Swiss Asset Manager No. 2.

14.   Among the various banks at which GIAN GISLER, the defendant, managed accounts and/or arranged for undeclared accounts to be opened and held (collectively, the "Gisler Banks") were:

a.   UBS: At all times relevant to this Indictment, UBS was a bank organized under the laws of Switzerland and was Switzerland's largest bank. UBS owned and

operated banking, investment banking, and stock brokerage businesses around the world, including in the Southern District of New York and elsewhere in the United States.

b.   Swiss Bank No. 1:  At all times relevant to this Indictment, Swiss Bank No. 1 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment, Swiss Bank No. 1 did not maintain an office in the United States.

c.   Swiss Cantonal Bank No. 1:  At all times relevant to this Indictment, Swiss Cantonal Bank No. 1 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment, Swiss Cantonal Bank No. 1 did not maintain an office in the United States.  Swiss Cantonal Bank No. 1 is one of approximately 24 banks that are either entirely or majority owned by one of the cantons (member states) of Switzerland.

d.   Swiss Bank No. 2:  At all times relevant to this Indictment, Swiss Bank No. 2 was a bank organized under the laws of Switzerland.  Until in or about 2005 or 2006, Swiss Bank No. 2 maintained an office in the Southern District of New York.

e.   Swiss Bank No. 3:  At all times relevant to this Indictment, Swiss Bank No. 3 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment,

Swiss Bank No. 3 did not maintain an office in the United States.

   f. <u>Swiss Bank No. 4</u>:  At all times relevant to this Indictment, Swiss Bank No. 4 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment, Swiss Bank No. 4 did not maintain an office in the United States.

   15. Among other services, the Gisler Banks provided private banking services -- that is, banking, investment, wealth management, and other financial services typically involving sizable assets and as contrasted with mass-market retail banking -- to U.S. taxpayers.

## The IRS' Qualified Intermediary Program

   16. In or about 2000, the IRS launched a new initiative called the Qualified Intermediary ("QI") Program. The program took effect starting in or about January 2001.  The QI Program was intended, among other things, to encourage foreign financial institutions to report "U.S. source income" to the IRS and to withhold taxes on that income as required by U.S. tax law so that U.S. taxpayers were properly paying U.S. tax. "U.S. source income" includes dividends paid on U.S. stock and capital gains paid on sales of U.S. stock, regardless of whether such dividends and capital gains are paid to a U.S. taxpayer.

17. The QI Program was also designed to help ensure that non-U.S. persons are subject to the proper U.S. withholding tax rates, including at reduced tax rates under applicable tax treaties, with respect to U.S. source income generated in an account overseas.

18. In or about 2001, each of the Gisler Banks separately entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS. The QI Agreements with the Gisler Banks were later renewed and were in effect throughout 2010.

19. Among other things, the QI Agreements that the Gisler Banks each separately executed required them, in general, to verify the identity and citizenship/domicile of certain of their clients through the execution of various forms. The QI Agreements also required the Gisler Banks, in general, to withhold and pay over, to the IRS, taxes on certain transactions in accounts that were beneficially owned by U.S. taxpayers.

20. In order to verify the identity and citizenship/domicile of certain of its clients, the QI Agreements generally required the Gisler Banks to obtain and maintain one of two forms:

a. The first form, Request for Taxpayer Identification Number and Certification (IRS Form W-9) ("W-9"), generally applied to bank clients who were U.S. persons. For such persons, the Gisler Banks were required generally to file

annually with the IRS a Form 1099 reporting the bank client's name, taxpayer identification number, and all reportable payments made to the bank client's accounts, such as dividends paid on U.S. securities.

        b.    In contrast, the second form, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (IRS Form W-8BEN) ("W-8BEN"), generally applied to bank clients who were non-U.S. persons.  On the Form W-8BEN, the bank client was required to provide various identifying information and to complete applicable certifications under penalties of perjury.  One of the certifications under penalties of perjury on the Form W-8BEN was that the beneficial owner was not a U.S. person.  Under the QI Agreements, the Gisler Banks were required to accept the Form W-8BEN, or a substantially similar substitute, and verify the information on it using other documents accepted as part of their account-opening procedures, such as articles of incorporation of the entities identified in the Form W-8BEN, in accordance with the rules already established by the jurisdiction in which QI participants were located.  As exemplified more fully below, GIAN GISLER, the defendant, accepted and caused others to accept, as part of the records of UBS and other Gisler Banks, Form W-8BENs, or the substitute forms utilized by UBS and other Gisler Banks, that falsely and fraudulently stated under penalties of perjury that,

among other things, the beneficial owner of accounts maintained at UBS was "not a U.S. person."  In truth and in fact, and as GISLER then and there knew, the beneficial owners were U.S. persons, a fact that was evident from documents maintained in the files of UBS and other Gisler Banks, among other ways.

21.  The contractual requirement in the QI Agreements that the Gisler Banks verify the identity of the beneficial owner of accounts held at the Gisler Banks was generally consistent with a voluntary code of conduct adopted by the Swiss Bankers Association, of which the Gisler Banks were members, which was referred to in an addendum to the QI Agreements.  The Swiss Bankers Association, founded in 1912, was a professional membership organization that, among other things, sought to develop self-regulatory standards for Swiss banks.  The Agreement on the Swiss Banks' Code of Conduct with Regard to the Exercise of Due Diligence (the "Swiss Banks Code") provided, in general, that signatories to the Swiss Banks Code engage in substantial efforts to verify the identity of the client in whose name the account was opened (referred to in the Swiss Banks Code as the "contracting partner") and, if not the same as the "contracting partner," verify the identity of the beneficial owner of the account.  The 1998 version of the Swiss Banks Code was identified in the QI Agreements themselves as one of the

regulations governing the obligations of the Gisler Banks to obtain documentation concerning the identity of account holders.

22.   For example, as of 2008, the Swiss Banks Code provided, in part, that:

> If the contracting partner is not the same as the beneficial owner, or if this is in doubt, the banks must require the contracting partner to complete Form A, thereby providing a written declaration of the identity of the beneficial owner.

As of 2003, the Swiss Banks Code provided, in part, that:

> All due diligence which can be reasonably expected under the circumstances must be exercised in establishing the identity of the beneficial owner. If there is any doubt as to whether the contracting partner is himself the beneficial owner, the bank shall require by means of Form A a written declaration setting forth the identity of the beneficial owner.

The Swiss Banks Code attached a specimen Form A to be used for this purpose.   In general, Form A required the person executing it to declare the identity of the beneficial owner of the assets deposited in the account that was opened in the name of the contracting partner.   The Gisler Banks generally employed Form A for this purpose.

## The Conspiracy

23.   From at least in or about the mid 1990's through at least in or about 2010, GIAN GISLER, the defendant, agreed with various U.S. taxpayers and others known and unknown, to defraud the United States, to conceal from the IRS on false tax returns the existence of bank accounts maintained at the Gisler

Banks, and the income earned in these accounts, and to evade U.S. taxes on income generated in these accounts.

## Means and Methods of the Conspiracy

24. Among the means and methods by which GIAN GISLER, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.  GISLER and his co-conspirators opened and maintained "undeclared accounts" on behalf of U.S. taxpayers at the Gisler Banks, that is, financial accounts maintained outside the United States and beneficially owned by U.S. taxpayers, but that were not disclosed to the IRS on Schedule B of Form 1040 or on an FBAR and the income generated in which was not reported to the IRS on Form 1040.

b.  GISLER and his co-conspirators used sham "foundations" formed under the laws of Liechtenstein to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at the Gisler Banks and the income generated in those accounts.

c.  GISLER and his co-conspirators used sham corporations formed under the laws of Hong Kong to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at the Gisler Banks and the income generated in those accounts.

d.    GISLER and his co-conspirators prepared and accepted W-8BENs, or the substitute forms utilized by the Gisler Banks, that falsely and fraudulently stated under penalties of perjury that the beneficial owner of a given undeclared account maintained at the Gisler Banks was "not a U.S. person," when, in truth and in fact, GISLER and his co-conspirators knew that, as reflected on Form A's and other documents contained within the files of the Gisler Banks, the beneficial owner of the particular undeclared account was a U.S. taxpayer.

e.    Co-conspirators of GISLER filed false and fraudulent Forms 1040, which, among other things, failed to report their interest in their undeclared accounts and the income generated in their undeclared accounts.

f.    Co-conspirators of GISLER failed to file FBARs identifying their undeclared accounts or filed false and fraudulent FBARs omitting their undeclared accounts.

g.    When GISLER and his co-conspirators believed that UBS might be forced to identify the beneficial owners of undeclared accounts held at UBS to the IRS, GISLER and his co-conspirators transferred the assets in the U.S. taxpayers' undeclared accounts at UBS to other Gisler Banks to which GISLER had introduced his U.S. taxpayer clients,.  While GISLER was employed at Swiss Asset Manager No. 1 and Swiss Asset Manager

No. 2, GISLER continued to manage these assets after their transfer from UBS.

        h.   GISLER and his co-conspirators arranged for account statements for the undeclared accounts of U.S. taxpayers not to be sent to the U.S. taxpayers in the United States.

        i.   GISLER, while in the United States, accepted cash from the undeclared accounts of at least one of his U.S. taxpayer clients, which GISLER distributed, while in the United States, to another of his U.S. taxpayer clients.

## GISLER'S U.S. Taxpayer Clients

        25.  At various times relevant to this Indictment, GIAN GISLER, the defendant, acting through UBS, Swiss Asset Manager No. 1, and Swiss Asset Manager No. 2 opened and/or managed more than 60 undeclared accounts for more than 38 U.S. taxpayers.

        26.  For example, GIAN GISLER, the defendant, managed and/or assisted in opening more than approximately 40 undeclared accounts for U.S. taxpayers at UBS, more than approximately 7 undeclared accounts for U.S. taxpayers at Swiss Bank No. 1, and more than approximately 5 undeclared accounts for U.S. taxpayers at Swiss Cantonal Bank No. 1.  Details for several examples of U.S. taxpayers for whom GISLER helped maintain undeclared accounts are set forth more fully below.

27.  The collective maximum value of the assets in undeclared accounts beneficially owned by clients of GISLER that were either opened with GISLER's assistance or were managed by GISLER was more than approximately $215.3 million, as reflected in paragraphs 36, 47, 57, 74, and 77.

## Client 1

28.  In or about 1993 or 1994, a lawful permanent resident of the United States who was a U.S. taxpayer ("Client 1") opened an undeclared account to be held at UBS in Switzerland.  Client 1 did so at UBS's branch office in Manhattan.  At or about the same time, Client 1 executed a document instructing UBS to hold all mail related to Client 1's account at UBS.  In connection with opening up the undeclared account, Client 1 was advised by a representative of UBS to fund Client 1's UBS account with cash so as to minimize any "paper trail."  Thereafter, Client 1 accumulated cash through his lawful business activities in the United States.  Client 1 brought the accumulated cash either to UBS's branch office in Manhattan or to UBS's headquarters in Zurich, Switzerland, to be credited to Client 1's account in Switzerland.

29.  In or about 1996, Client 1 became a citizen of the United States.

30. In or about 1998 or 1999, GIAN GISLER, the defendant, became Client 1's client advisor at UBS.

31. In or about October 1999, Client 1 opened, and caused to be opened, an account in the name of Jeleit Foundation, an entity previously formed under the laws of Liechtenstein, into which the assets from Client 1's original undeclared account at UBS were transferred.

32. Thereafter, Client 1 and GIAN GISLER, the defendant, met approximately twice a year in Manhattan and sporadically in Zurich, Switzerland, to discuss, among other things, the investment results in Client 1's account at UBS.

33. In or about late 2000, GIAN GISLER, the defendant, advised Client 1 at a meeting in Switzerland that, as a result of changes, Client 1's holding an account in the name of the Liechtenstein foundation was not safe anymore and that Client 1 should hold Client 1's account in the name of a Hong Kong corporation. Thereafter, GISLER introduced Client 1 to a Swiss attorney, Matthias W. Rickenbach ("Rickenbach"), a co-conspirator not named as a defendant herein.

34. In or about 2000, Rickenbach assisted Client 1 in setting up Aljeleit Trading Ltd., a corporation organized under the laws of Hong Kong. Rickenbach was a director of Aljeleit Trading Ltd. The purpose of Aljeleit Trading Ltd. was for Client 1 to hold Client 1's undeclared account at UBS.

17

35.   In or about November and December 2000, Rickenbach and/or GIAN GISLER, the defendant, executed and/or accepted into UBS's files for Client 1 various documents necessary to open an account at UBS in the name of Aljeleit Trading Ltd., including, among others:

a.   A Form A indicating that the beneficial owner of the account opened in the name of Aljeleit Trading Ltd. was Client 1 and that Client 1 was a U.S. citizen; and

b.   A substitute W-8BEN in which Rickenbach falsely and fraudulently swore under penalties of perjury that the beneficial owner of the Aljeleit Trading Ltd. account was a foreign person.  In truth and in fact, and as Rickenbach and GISLER then and there well knew, the beneficial owner of the Aljeleit Trading Ltd. account at UBS was Client 1 and also a U.S. person, which was evident from documents maintained in the files of UBS.

36.   In or about December 2000, the Aljeleit Trading Ltd. account at UBS held assets valued at approximately $5.121 million.  At various times from in or about 2000 until in or about 2008, Client 1 held U.S. securities in the Aljeleit Trading Ltd. account at UBS.

37.   In or about 2002, Client 1 provided approximately $150,000 in cash to GIAN GISLER, the defendant, while GISLER was in Manhattan, to be credited to Client 1's account at UBS.  At

18

or about the same time, GISLER informed Client 1 that GISLER was going to provide the cash to two other UBS clients, a married couple that resided in Queens, New York, who wished to make a cash withdrawal from their UBS account. In or about 2003, GISLER and Client 1 repeated this same procedure with another $100,000, which GISLER told Client 1 that GISLER was again going to give to the same couple to whom GISLER had given the cash that Client 1 provided to GISLER in 2002. As a result of these transactions, clients of UBS were able to make cash deposits into, and withdrawals from, their undeclared accounts at UBS, without any client of UBS, or a client advisor of UBS, traveling into, or leaving from, the United States with the cash.

38. In or about April 2005, and in the presence of GIAN GISLER, the defendant, Rickenbach falsely and fraudulently swore in a substitute W-8BEN under penalties of perjury that Aljeleit Trading Ltd. was "the beneficial owner under US tax law of all the income to which th[e] form relate[d]." In truth and in fact, and as Rickenbach and GISLER then and there well knew, Client 1 was a U.S. person and the beneficial owner of the income generated in the Aljeleit Trading Ltd. account at UBS, which was evident from documents maintained in the files of UBS. GISLER accepted the false and fraudulent substitute W-8BEN into UBS's files.

39. In or about December 2008, Client 1 spoke by telephone with GIAN GISLER, the defendant. GISLER informed Client 1 that Client 1's account at UBS had been frozen.

40. Thereafter, Client 1 sought the assistance of Rickenbach. Rickenbach informed Client 1 that UBS wanted to wanted to close all U.S. accounts, but suggested that Client 1 use foreign documents to show UBS that he was not a U.S. citizen. As a result, Client 1 arranged for friends in Canada to switch their utility bills into Client 1's name and Client 1 opened a Canadian bank account, all for the purpose of establishing Client 1's purported non-U.S. residency. However, Client 1 was never able to unfreeze Client 1's account at UBS.

41. On Client 1's Forms 1040 for the tax years 2004 through and including 2009, Client 1 did not report either Client 1's interest in or signature or other authority over Client 1's account at UBS. Moreover, for the tax years 2000 through and including 2007, Client 1 did not file an FBAR disclosing Client 1's account at UBS.

### Client 2

42. In or about 1967, a citizen of the United States who was a U.S. taxpayer and who then resided in Manhattan ("Client 2") opened an undeclared account at a predecessor of UBS.

43.   In or about 2000, GIAN GISLER, the defendant, became the client advisor for Client 2's undeclared account at UBS.

44.   After becoming Client 2's client advisor, GIAN GISLER, the defendant, advised Client 2 to be discreet in Client 2's communications with UBS because Client 2's account was undeclared and, as a result, was illegal.

45.   In or about early 2002, Client 2 wrote to GIAN GISLER from Client 2's residence in Manhattan to request that GISLER periodically send to Client 2's residence in Maine $2,000 in travelers checks, which were to be purchased with funds from Client 2's undeclared account at UBS.

46.   Between about 2004 and 2007, Client 2 met with GIAN GISLER, the defendant, on multiple occasions in Manhattan to review Client 2's undeclared account at UBS.

47.   In or about June 2007, Client 2's account at UBS held assets valued at approximately $3.525 million.

48.   In or about late 2008, GIAN GISLER, the defendant, informed Client 2 that GISLER was leaving the employment of UBS for employment at Swiss Asset Manager No. 1. At or about the same time, Client 2 learned that UBS would no longer permit him to maintain his undeclared account at UBS.

49.   In or about early November 2008, GIAN GISLER, the defendant, introduced Client 2 to Swiss Bank No. 4, where Client

2 opened an undeclared account, with GISLER, on behalf of Swiss Asset Manager No. 1, acting as the financial advisor.

50.   Thereafter, in or about November 2008, and with the assistance of GIAN GISLER, the defendant, Client 2 requested that UBS transfer all assets held in Client 2's undeclared account at UBS to Swiss Bank No. 4.

51.   In connection with the opening of Client 2's account at Swiss Bank No. 4, a representative of Swiss Bank No. 4 circulated a memorandum internal to the bank stating in German, among other things, that "[t]he above client is a citizen of the USA.  A W-9 form was not signed."  The memorandum further indicated that the Client 2 would be serviced by Swiss Asset Manager No. 2.  The memorandum sought approval for the opening of the account "taking into account the management decision that such accounts may still be opened for this EVV [the German abbreviation for external asset manager]."  Another representative of Swiss Bank No. 4 approved the opening of the account.

52.   On Client 2's Forms 1040 for the tax years 2004 through and including 2009, Client 2 did not report either Client 2's interest in or signature or other authority over Client 2's account at UBS or Swiss Bank No. 4.  Moreover, for the tax years 2000 through and including 2007, from in or about

2001 through in or about 2008, Client 2 did not file an FBAR disclosing Client 2's account at UBS or Swiss Bank No. 4.

### Client 3

53.   In or about 1967, a citizen of the United States who resided in the State of New York and who was a U.S. taxpayer ("Client 3") inherited an account from a relative that was held at a predecessor of UBS.

54.   In or about 1994, Client 3 opened a new undeclared account at UBS in the name of the Syntax Foundation, a foundation that had previously been organized under the laws of Liechtenstein by an attorney recommended by a representative of UBS.   Thereafter, the assets of the inherited account at UBS were transferred into the Syntax Foundation account at UBS.

55.   In or about 1997 or 1998, GIAN GISLER, the defendant, became the client advisor for Client 3's undeclared account at UBS.

56.   In or about November 2000, a director of the Syntax Foundation prepared, and GIAN GISLER, the defendant, accepted as part of UBS's files for Client 3, a form instructing UBS to sell all U.S. securities and not to thereafter invest in U.S. securities "so that reportable amounts for US tax purposes are not created."

57.   At or about the end of 2007, Client 3's account at UBS held assets valued at approximately $1.547 million.

58.   In or about 2008, Client 3 met with GIAN GISLER, the defendant, at GISLER's office at UBS in Zurich, Switzerland. GISLER informed Client 3 that UBS was no longer going to permit U.S. taxpayers to maintain accounts at UBS.  GISLER recommended that Client 3 open an account at a bank that did not have reservations about having U.S. taxpayers as account holders and that would allow Client 3 to maintain Client 3's account as undeclared.  GISLER recommended that Client 3 open an account at Swiss Cantonal Bank No. 1.  Thereafter, GISLER escorted Client 3 to Swiss Cantonal Bank No. 1, at which time Client 3 opened an undeclared account at Swiss Cantonal Bank No. 1 in the name of the Syntax Foundation, the same sham foundation in which Client 3 had held Client 3's undeclared account at UBS.

59.   In or about the Fall of 2008, GIAN GISLER, the defendant, informed Client 3 that GISLER was leaving UBS for Swiss Asset Manager No. 1, but that he would manage Client 3's account at Swiss Cantonal Bank No. 1 through Swiss Asset Manager No. 1.

60.   After GIAN GISLER, the defendant, left Swiss Asset Manager No. 1 for Swiss Asset Manager No. 2, and in or about November 2009, GISLER assisted Client 3 in opening an undeclared account at Swiss Bank No. 3, which was to be managed by GISLER through Swiss Asset Manager No. 2.  At the time that Client 3 opened Client 3's undeclared account at Swiss Bank No.

24

3, Client 3 was provided with an alias, "Flakes." The account-opening documents prepared for Client 3's account at Swiss Bank No. 3 and signed by representatives of Swiss Bank No. 3 and GISLER, among others, indicated that Client 3 was a U.S. citizen and that Client 3 held a U.S. passport. The account-opening documents prepared for Client 3's account at Swiss Bank No. 3 also indicated that Client 3 would not invest in U.S. securities and that Client 3's account was to be "ausserhalb," meaning "outside" in German, the "QI-system."

61.   On Client 3's Forms 1040 for the tax years 2004 through and including 2008, Client 3 did not report either Client 3's interest in or signature or other authority over Client 3's account at UBS, Swiss Cantonal Bank No. 1, or Swiss Bank No. 3. Moreover, for the tax years 2000 through and including 2009, Client 3 did not file an FBAR disclosing Client 3's account at UBS, Swiss Cantonal Bank No. 1, or Swiss Bank No. 3.

## Client 4 and Client 5

62.   A wife ("Client 4") and husband ("Client 5"), who were citizens of the United States and Switzerland and who resided in the State of New Jersey, opened undeclared accounts at a predecessor of UBS. Client 4 opened her undeclared account in or about the early 1980's. Client 5 opened his undeclared

account in or about 1978.  At all times relevant to this
Indictment, Client 4 and Client 5 were U.S. taxpayers.

63.  Client 4 periodically met with one of her UBS
client advisors (the "Client 4 and 5 Advisor") in Manhattan and,
on several such occasions, Client 4 gave the Client 4 and 5
Advisor approximately $5,000 to $6,000 in cash to be deposited
into Client 4's undeclared account at UBS.

64.  In or about 2003 or 2004, the Client 4 and 5
Advisor informed Client 4 that the Client 4 and 5 Advisor was
leaving UBS to begin working as an independent financial
advisor.  Periodically, thereafter, the Client 4 and 5 Advisor
sought to recruit Clients 4 and 5 to follow him and have him
manage their accounts, which would be held at a Swiss bank other
than UBS.  On one such occasion, the Client 4 and 5 Advisor sent
Client 4 and 5 a brochure concerning Swiss Bank No. 1 as a
recommendation of a bank at which to hold an undeclared account.

65.  In or about 2004 or 2005, GIAN GISLER, the
defendant, became the client advisor for Client 4 and Client 5
at UBS.

66.  In or about 2005 and 2006, GIAN GISLER, the
defendant, met with Client 4 and Client 5 in Manhattan on at
least two occasions.  The purpose of these meetings was to
review the performance of Client 4 and Client 5's accounts at
UBS.

67.   In or about early 2008, the Client 4 and Client 5 Advisor wrote to Client 4 and Client 5 at their New Jersey address:

> THEY finally did what was widely expected 3-4 years ago!  US clients have zero protection anylonger [sic] and the team in my country will be closed down!

> I have known you and your family for a long time.

> I am here to help.  But, of course, only if you are willing to accept my help!

The Client 4 and 5 Advisor attached with his letter a copy of a January 2008 newspaper article from the Financial Times entitled "UBS to wind down offshore private banking for US clients."

68.   In or about late 2008, GIAN GISLER, the defendant, informed Client 4 that GISLER was leaving UBS.

69.   Several weeks later, Client 4 and Client 5 traveled to Zurich, Switzerland, to meet with GISLER.  By that point, GISLER was employed by Swiss Asset Manager No. 1.  During the meeting, GISLER advised Client 4 and Client 5 that they were required to close their accounts at UBS.  GISLER also proposed that, through Swiss Asset Manager No. 1, he manage their assets, which would be held at either Swiss Bank No. 1 or Swiss Bank No. 2.

70.   On the same day as the meeting described in paragraph 69, above, or the next day, GIAN GISLER, the defendant, escorted Client 4 and Client 5 to Swiss Bank No. 1 to

meet with two representatives of Swiss Bank No. 1, who were informed that Client 4 and Client 5 were being required to leave UBS and were seeking to open undeclared accounts at Swiss Bank No. 1.

71.   After the two representatives of Swiss Bank No. 1 had completed their interview of Client 4 and Client 5, one of the two representatives of Swiss Bank No. 1 informed Client 4 and Client 5 that Swiss Bank No. 1 would accept Client 4 and Client 5 as account holders.  Client 4 and Client 5 completed various account-opening documents necessary for them to open accounts at Swiss Bank No. 1, which were to be managed by GIAN GISLER, the defendant, through Swiss Asset Manager No. 1.  At or about the time that Client 4 and Client 5 opened their accounts at Swiss Bank No. 1, Swiss Bank No. 1 received and thereafter maintained Form A's listing Client 4 and Client 5 of New Jersey as the beneficial owners of their accounts at Swiss Bank No. 1.

72.   At or about the time that Client 4 and Client 5 opened their accounts at Swiss Bank No. 1, one of the representatives instructed Client 4 and Client 5 to each select a secret code name for Client 4 and Client 5 to use when contacting Swiss Bank No. 1.  In this regard, the account-opening documents executed by Client 4 and Client 5 provided (in German), in relevant part:

The Client authorizes the Bank to operate the account and safekeeping account under number or code name referred to under 1. above. . . .

Instead of using his/her usual signature in dealings with the Bank, the Client may write out the number or code name of the account or safekeeping account.

73.   Thereafter, in or about October 2008, and with the assistance of GIAN GISLER, the defendant, Client 4 requested that UBS transfer all assets held in Client 4's undeclared account at UBS to Swiss Bank No. 1, which was to be managed by GISLER through Swiss Asset Manager No. 1.

74.   At or about the end of 2008, Client 4 and Client 5's accounts at Swiss Bank No. 1 held assets valued at approximately $1.948 million.

75.   On Client 4 and Client 5's joint Forms 1040 for the tax years 2004 through and including 2008, Client 4 and Client 5 did not report either Client 4 and Client 5's interests in or signature or other authority over their accounts at UBS or Swiss Bank No. 1.   Moreover, for the tax years 2000 through and including 2008, from in or about 2001 through in or about 2009, Client 4 and Client 5 did not file an FBAR disclosing Client 4 and Client 5's accounts at UBS or Swiss Bank No. 1.

## Additional U.S. Taxpayer Clients of GISLER

76.   At all times relevant to this Indictment, Swiss Bank No. 5, Swiss Bank No. 6, Swiss Bank No. 7, Swiss Bank No. 8, and Swiss Bank No. 9 were banks organized under the laws of

Switzerland.  At all times relevant to this Indictment, Swiss
Fund No. 1 was an investment fund and asset manager organized
under the laws of Switzerland.

      77.  In furtherance of the conspiracy, GIAN GISLER,
the defendant, assisted, among other U.S. taxpayers, the
following U.S. taxpayers identified below in ways that were
substantially similar to the services that he provided to
Clients 1 through 5, as described above:

| State of Residence of U.S. Taxpayer | Approximate Dates During Which UBS Account Open | Bank(s) to Which Assets Were Transferred from UBS | Highest Approximate Value of Account between Approximately 2003 and 2010 |
|---|---|---|---|
| New York | 1987-2008 | Swiss Cantonal Bank No. 1 | $10,201,581 |
| California | 1980-2008 | Swiss Cantonal Bank No. 1 | $3,781,882 |
| Maryland | 1997-2008 | Swiss Cantonal Bank No. 1 | $4,700,000 |
| Maryland | 2004-2008 | Swiss Cantonal Bank No. 1 | $4,700,000 |
| California | 1983-2008 | Swiss Bank No. 1 | $19,700,000 |
| New Jersey | 1995-2008 | Swiss Bank No. 2 | $2,098,700 |
| New York | 2003-2008 | Swiss Bank No. 2 and Swiss Bank No. 1 | $1,200,000 |
| New York | 1980-2008 | Swiss Bank No. 2 | $42,743,700 |
| New York | 1937-2008 | Swiss Bank No. 2 and Swiss Bank No. 1 | $43,273,343 |
| New York | 1962-2008 | Swiss Cantonal Bank No. 1 and Swiss Bank No. 5 | $13,334,997 |
| New York | 1973-2008 | Swiss Bank No. 6 | $2,332,870 |
| New York | 2000-2008 | Swiss Fund No. 1 | $5,012,975 |
| Florida | 1993-2008 | Swiss Bank No. 1 | $2,544,609 |
| Washington, DC | 1988-2009 | n/a | $1,216,322 |
| Connecticut | 1970-2008 | n/a | $3,154,060 |
| New York | 1970-2008 | n/a | $1,469,973 |
| New York | 1970-2008 | n/a | more than $2,500,000 |
| Florida | 1989-2009 | n/a | more than $1,000,000 |
| New York | 1960-2009 | Swiss Bank No. 7 | $1,909,000 |
| New York | 2004-2008 | Swiss Bank No. 8 | $1,966,095 |
| New York | 1966-2008 | Swiss Bank No. 4 | $697,855 |
| New York | 1970-2008 | Swiss Bank No. 1 | $3,044,800 |
| New York | 1986-2009 | n/a | $671,000 |
| Maryland | 1963-2008 | n/a | $6,491,000 |
| Rhode Island | 1997-2009 | n/a | more than $2,500,000 |
| New York | 1998-2008 | n/a | $129,424 |
| New York | 1996-2008 | Swiss Bank No. 1 | $2,569,012 |
| New York | 1980-2008 | Swiss Bank No. 9 | $1,213,220 |
| New York | 2005-2008 | n/a | $11,708,074 |
| Maryland | 1996-2008 | n/a | $2,531,245 |
| New York | 1998-2008 | Swiss Bank No. 4 | more than $1,000,000 |
| Total | | | more than $203,183,649 |

## Statutory Allegations

78.    From at least in or about the mid-1990's through at least in or about 2010, in the Southern District of New York and elsewhere, GIAN GISLER, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 26, United States Code, Section 7206(1).

79.    It was a part and an object of the conspiracy that GIAN GISLER, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

80.    It was further a part and an object of the conspiracy that GIAN GISLER, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America from clients of GISLER's

who were U.S. taxpayers, in violation of Title 26, United States Code, Section 7201.

81.   It was further a part and an object of the conspiracy that GIAN GISLER, the defendant, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which GISLER, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

### Overt Acts

82.   In furtherance of the conspiracy and to effect the illegal objects thereof, GIAN GISLER, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about 2002, Client 1 provided approximately $150,000 in cash to GISLER, while in Manhattan, to be credited to Client 1's account at UBS.

b.   In or about early 2002, Client 2 wrote to GISLER from Client 2's residence in Manhattan to request that GISLER periodically send to Client 2's residence in Maine $2,000

in travelers checks, which were to be purchased with funds from Client 2's undeclared account at UBS.

        c.    In or about November 2009, GISLER assisted Client 3 in opening an undeclared account at Swiss Bank No. 3, which was to be managed by GISLER through Swiss Asset Manager No. 2.

        d.    In or about 2005 and 2006, GISLER met with Client 4 and Client 5 in Manhattan on at least two occasions.

(Title 18, United States Code, Section 371.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

GIAN GISLER,

Defendant.

INDICTMENT

11 Cr. _____ (\_\_\_\_\_)

(Title 18, United States Code,
Section 371.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

8-4-11 Filed Indictment. A/W issued. Cure assigned
to Judge Stein.

Pitman
U.S.M.J